Johnson, J.
The complainants present three distinct claims for relief :
I. They charge that the claim for over $18,000 as commissions for settling the debt to the Bank of the United States was illegal.
II. That as only a partial settlement of their accounts was made in 1828, and no final account was ever made, that Longworth should be compelled to make such settlement according to law; and to this end they ask to be relieved of the settlement of June 19,1846, which is alleged was obtained by fraud and concealment.
III. That the sales of land to or for Catharine Long-worth, Elizabeth Morris, and John Longworth, his sisters and brother, and reconveyance back, was a breach of trust by Mr. Longworth.
To these claims the respondents interpose and say:
1. They deny specifically all fraud or concealment.
2. They insist that this allowance of commissions for settling the bank debt was for services actually rendered of great value; that the matter was duly examined and *182 properly allowed by the court in 1825 upon exceptions thereto, and can not now be re-examined.
3. That the settlement of June 19,1846, is free from fraud and concealment, and is full and final as to all matters complained of.
4. That as to so much of the bill as seeks an account of administration proper, the Probate Court, since the act of 1853, defining the jurisdiction of the Pfobat^ Court, has exclusive jurisdiction.
5. That the original claim was in its nature joint, and the compromise with the co-administrator, B. M. Piatt, and dismissal of the case as to him, is a bar to all further proceedings against Longworth.
6. That these several demands are barred by the statute of limitations or by lapse of time.
7. That there is a fatal variance between the allegations of the bill and the proofs.
8. Entire want of equity in the case as made.
We will consider these claims in their order :
1. As to the commissions charged on the bank debt. The estate owed the bank $300,873.69, secured by mortgage. An arrangement was made by the administrators by which the heirs conveyed to the bank the equity of redemption in the mortgaged premises in discharge of this debt, and others to the bank on which the deceased was liable as an indorser.
By the statute in force at the time (2 Chase, 1309, see. 8), the administrator is required to render a written account, in which he shall charge himself with the amount of the estate, according to the inventory of sale, including all debts due the estate and moneys on hand at death, and credit himself with all moneys lawfully expended in settling said estate by payment or otherwise, and exhibit vouchers and receipts. The court shall also allow as credits all debts to the estate, with which he is charged, that could not be collected, and shall allow the administrator a credit for any 'sum not exceeding six per cent, on the amount by him *183 settled, and such, other sum'for extra trouble and expense as is deemed reasonable.
The administrators charged thernselves with the amount due the bank, treating the transaction as though the bank had paid that amount for the equity of redemption, and credited themselves with the same amount as if the debt had been paid in money.
By this method, which perhaps was well enough as a record of the transaction, the receipts were $303,693.25, instead of $3,119.56 actually received; and the payments were $302,286.23, instead of $1,412.54 actually disbursed. The charge for services in settling this large debt is in these words : “ Administrator’s charge on' disbursements, six per cent., $18,137.17.”
It is admitted that this settlement with the bank was very advantageous to the estate.
It is also clear that for this valuable service the administrators were entitled to liberal compensation for extra trouble in settling this business; but as commissions on disbursements, we do not think this charge warranted by law. To so regard it, requires a strained construction of the statute.
This percentage, provided by the statute, was intended to compensate for the trouble and responsibility of collecting and paying out moneys.
The estate was regarded as insolvent, and while it is doubtless true that this adjustment largely contributed toward realizing something for the heirs, yet the amount of this charge, even in this day of extravagant fees, seems far more than adequate for the service; but they were entitled to a fair and liberal allowance for this service, though not as commissions for disbursements.
The claim was made to the proper court, and was laid-over under the statute until the next term, to give all persons interested an opportunity to except. Exceptions were filed in 'behalf of creditors, and the court made the allowance. The records showing this allowance were open to *184 inspection, and no complaint was made by any of the heirs for twenty-five years.
Under these circumstances we do not feel warranted now in disturbing that allowance, especially in view of the final settlement of June 19, 1846, of all matters of account.
The second ground for relief sought is to have an account of administration from the date of the last one in 1828.
It appears none was filed after that date, nor was any demanded, either by creditors or heirs, until June, 1846, a period of eighteen years.
During this time lands were sold, assets collected, debts paid or compounded, etc. At the end of- this time, the claims of creditors were all .extinguished either by payment, composition, or lapse of time.
The only parties, therefore, who had an interest in calling these administrators to a settlement were these complainants.. They had the power to cite them to such set-* tlement in court. They, through the late Judge Reed, initiated steps for a final adjustment and surrender to the heirs of the remaining assets, among which was a large claim against the United States.
The result was this agreement of June 19, 1846. By its terms a final settlement was made with the administrators, and each of them. It was therein declared to be “ a full and complete settlement of all matters that have been administered by and through the said Benjamin M. Piatt and Nicholas Longworth, as administrators as aforesaid.”
Complainants seek to impeach this settlement because of alleged fraud and concealment, and for the reason that two of the heirs were minors, by reason of which the rights of all are saved.
• As to fraud and concealment, the onus is upon the complainants. The parties met pursuant to previous arrangements. Larz Anderson, the son-in-law of Longworth, who before that was unacquainted with the accounts, prepared himself by an examination of the records of the court and the papers, and on the day of meeting exhibited a statement *185 debiting the administrators with' the cash balance, some $14,000, in 1828, and subsequent receipts from sale of lands and other sources, less commissions and expenses, making total debits $46,242.15. On the credit side there are one hundred and fifty-one items, being sundry .debts, expenses, etc., $124,425.69, leaving a “ balance due from the estate of $78,183.53.”
It was explained, however, that the estate did not in fact owe them this balance; that these items of credits were made up by the face of the debts paid, and were not the amounts actually paid, because large discounts were obtained on most of them. Something was said about Mr. Longworth’s not having made an account of receipts and disbursements; but B. M. Piatt stated his belief, from his knowledge of the business, that Mr. Longworth had paid out quite as much as he had received; or, if not, that the difference was not worth contesting.
With this statement the other party appealed satisfied, and no such account was insisted on.
This was the evidence of Mr. Anderson. It stands uncontroverted. Why was it that the heirs preferred this method of settling to that provided by law ?
We are left wholly to conjecture for the reason. We know, however, that they voluntarily adopted it, and did not insist on having an itemized statement of disbursements; but acquie'sced in the statement of Judge Piatt, that the difference was not worth contesting. There is no evidence that this statement was not substantially true. They accepted it as true and executed this release. Unless it be shown that it was false, this settlement must stand.
The heirs might have properly demanded an itemized account of disbursements, supported by vouchers; and, upon refusal, could have-had a citation issued compelling an account. Eor reasons satisfactory to themselves they waived this right, and acted on the assurance of Judge Piatt, that Longworth had paid out about as much as he had received. It does not appear that this assurance was not true.
Whether it was true or not, it is now impossible perhaps *186 to ascertain, and. we do not think these complainants can now demand what they then did not choose to insist on.
It is said these minors were not bound by this settlement. Admit it, and what follows ? On coming of age they could disaffirm or disregard it, and call for an account. This agreement was no cloud upon their right to such an account. As to them no final settlement had been made. They had a plain, adequate, and complete remedy at law.
In case of the heirs who were of age, there was perhaps a necessity to invoke the aid of a court of equity to have this agreement canceled, to remove the cloud upon their right to an account. As to these minors, against whom it was void at common law, no such cloud existed.-
Until they have exhausted their legal remedy we are unable to see what standing they have in a court of equity.
As to them, therefore, their rights were unaffected by this agreement; and unless barred by the statute of limitations or other defense, they are as free now to demand an account in the Probate Court as if it had never beeu made.
Since the probate act of 1853, that court has exclusive jurisdiction of the settlement of accounts of executors and administrators. When that remedy proves inadequate the aid of a court of equity may be invoked.
III. The remaining question relates to the sales of lands to and for the brother and sisters of Mr. Longworth. Was the relation that he bore to these transactions such that, in equity, he was guilty of a breach of trust ? What were the facts ? The first sale of land was to take place July, 1825. On the 15th of May previous, Mr. Longworth, in view of the first sale, writes to his sister Catharine, who resided in Newark, New Jersey :
“ Dear Catharine : — The sale of the real estate of the late John H. Piatt takes place in six or seven weeks ; most of the property is valued low, and will be sold (should no person bid more) from one-half to two-thirds the amount of valuation. As administrator, I am proscribed from purchasing, but shall have considerable fees as administrator, that 1 could apply in any purchase you might make, *187 and the purchase-money could be repaid me from the sales. I have no doubt a considerable profit could be made; I therefore wish you to write Jones, and direct him to attend at the sales and purchase such as may be deemed advisable. I will with him particularly examine the several pieces, and decide which will be the most advantageous purchases. Do not omit writing soon.”
In July, 1825, after the sale had taken place, at which some of the lands were returned as sold to her, he again writes her : “ The property bid in at the sale, as far as any profit is made, is intended for your benefit; what I could not do directly, I would not, do indirectly. I, however, made the greatest exertion to make the property bring a high price, and it will lessen your profits. The amount purchased for you was about $5,000, and you may be assured it will net you a handsome profit.” In this letter he encloses some money, and says: “ I shall furnish you such sums as you may want •” and assures her he will furnish means for her aiid his brothers John and Jabez, as they may need.
It is worthy of remark, in this connection, that the proof abundantly shows that, both before and after this sale, Mr. Longworth was kind and liberal to his less prosperous relatives in New Jersey, and, as his sisters testify, was constantly urging them to accept more of his bounty. This liberality was independent of any profits to be made out of these lands.
In view of a second sale of lands' in 1827, he again writes to his sister :
Cincinnati, January 22,1827.
“ Dear. Catharine : — I learn from Jones that Jabez has had a bad time, and wait anxiously for a letter from you. We are all in good health. I inclose a check for Jabez, in your name, for $200. I will remit him one for the same amount every ninety days, till I can do better ; that amount will, I presume, meet his wishes; if not, it shall be increased at any sacrifice. There will be a second sale of the real estate of John H. Piatt, deceased, in a few days, *188 when I intend, should the property go low, to have some hid in for John’s use. I have no doubt $2,000 or $3,000 may be made by it.”
Under date of November 26,1833, referring to these investments, he writes to her and says : “ I have made some investments for your’s, sister’s, and John’s benefit in -real estate, which turns out well, and Phope to be with you in a few months, and finally settle our concerns.”
Again, under date of December 26, 1833, he adds: “ I think both your building and your contemplated expenses are on too small a scale, for I know of no motive you can have for hoarding up. I made, some years since, some purchases for your’s and brother John’s benefit, and some for sister — one, you will recollect, from Ludlow’s estate.”
He then ..states that Piatt had purchased a lot of Kidd at too high a price ; that Kidd owed the purchase-money on this lot to Ludlow’s estate; that Piatt’s estate owed Kidd more than the lot was worth ; that, seeing that Ludlow’s executor’s claim was paramount on this lot, so that Piatt’s estate would lose the lot and owe Kidd for it besides, he formed the plan to buy in the Ludlow claim against Kidd; he proposed that the Piatt heii’s should do this, but they declined, and he says : “As administrator of Piatt, I considered myself as legally disqualified from buying, and what I could not do directly, it would have been dishonest to do indirectly. I therefore took the interest in your name.” And after telling her how the matter ended successfully, says: “¥e have recovered the property, and I shall take possession in a few months, and I think the rents, since our purchase, will pay Kidd for improvements.”
He concludes this significant letter as follows :
“ Half the rents, after paying taxes and repairs, will not, even at this time when things are depressed, I think, be less than $600 per year. 1 wash my hands of it. If I pretend to common honesty, I can make no claim of it, or consider any part of it mine; had I been indirectly the purchaser, it is possible the court would have decreed me the purchases for Piatt’s estate, as I was his administrator, *189 and the result would have been that after deducting the amount for Ludlow’s heirs, the estate of Piatt would have been compelled to hold the property to pay the balance after Kidd’s heirs had sold it in part payment, and the whole would have centered in Ludlow’s heirs toward paying their jiidgment of $30,000. My only' claim on the property thereof is the amount of money I paid, with interest since. This will be something over $2,000, besides what I paid Lewis, but it was not much. When Joseph is east next season, I shall bring all matters to a close, and finally settle your sister’s and John?s claim. There shall be nothing of obligation in matters of business. I shall settle them as an honest man would settle them with his enemies. The purchases I made for sister’s use were under like circumstances, when I could not and would not have purchased for myself.”
February 9, 1834, he answers a letter from his sister, who had made some allusion to the letter just quoted, and assures her it was strictly true .that he could claim no part of the property: “ I could not both buy and sell; had I bought in the name of another for my use, the heirs or creditors would claim the benefit of it. That matter will be settled as a mere matter of business.”
June 6, 1834, he again writes Catharine, expressing a wish to close up this business with her, Mrs. Morris, and John, and also obtain their interests in their brother Jabez’s estate.
Of Mrs. Morris he says: “ I made some investments here, the profits of which were intended for her.”
As life is uncertain, he wishes these matters closed up, and proposes to take a release of Mrs. Morris of her interest in her brother’s estate, “ and of her interest in the investment, and secure $7,000 to her, with interest payable yearly.” He wishes also to close up with her and John in the same way. He assures them “ that their rights and brother’s is as absolute, in the investments I made, as your interest in brother’s estate.” “ As I was a trustee in the case of the *190 purchases, I could, not have made them myself. I shall feel easier in mind when I have these matters closed.”
From this letter it appears he had invested $8,000 of these fees for them; that he had already sold one piece at a profit of $2,000, and that the whole was worth $12,000 more than cost, interest, and expenses. For a release by them of their interests in these investments, not a purchase by him from them, he proposes to give his obligations, lumping these interests with their interests in brother Jabez’s estate, at $17,000.
November 29, 1834, in consideration of this plan, he gives his obligation to John and Catharine Longworth, to pay each of them, during their lives, $300 per annum, and at their deaths $5,000 each, to such persons as they might by will name: “ The consideration for this obligation being a deed of quitclaim to certain real estate in Ohio, to be by them executed to the said Nicholas, the obligor, being certain real estate bought and paid for by the obligor, but the profit thereon being for their benefit, and a release from them to the obligor, of all their interest in the real and personal estate of the deceased brother, Jabez Longworth, and except any claim they made on real estate of the said Jabez in the State of New Jersey; said obligations and mortgages to be executed, recorded, and delivered to them as soon as I receive their release of quitclaim aforesaid.”
On the same day he executes a similar obligation to Mrs. Morris for $7,000, “the consideration being a quitclaim deed by her to me, to be executed for certain real estate in this city, bought for her benefit; that is, any profit made thereon, after deducting purchase money which loas advanced by me,” etc.
To secure these obligations he executes mortgages on real estate, in Cincinnati, and on the 17th of December, 1834, Catharine Longworth, John Longworth, and Elizabeth Morris conveyed back, by deed of quitclaim, “ all their rights, legal or equitable,” in the lands the administrators had shortly before conveyed to them.
The consideration named in this deed to Longworth was *191 $17,000 — i. e., $5,000 each, to John and Catharine, and $7,000.to Mrs. Morris.
The deed was prepared at Mr. Longworth’s instance and forwarded for them to execute. After describing the land is the following recital, which, as coming from Mr. Longworth, though in the deed to him, becomes important : “ The facts are these — N. Longworth, our brother, purchased real estate in our names, and advanced the purchase money ; any profit the property might bring after repaying him, being intended for our use. Some parts have been sold, and the object now is to vest all such purchases in him and his heirs, he having secured to us a certain sum, agreed to be given us for the profits.”
It thus appears he had invested over $5,000 for Catharine, and $8,000 altogether; hut in 'closing up he ignores these facts altogether. He says the entire profits would be $12,000. Catharine’s share of these profits should have been in the same proportion if she was a bona fide owner. Instead of this, she gets less than Mrs. Morris, who had a family to support; thus showing that he was not paying debts, but making provisions for these relatives.
From the first letter, of May 15, 1825, to the final close of these real estate transactions, in 1835, Nicholas Long-worth “looked after and was the manager of this business.” He advanced the money, or rather no money was advanced, but his share of this large fee complained' of was not withdrawn from the estate, but allowed to offset these purchases. He attended to making these purchases i n their names or for them.
Mrs. Morris says : “ "We looked on our brother Nicholas as our agent in every respect, to do for us as he thought best. We had no other agent there. He always attended to everything for us to the best advantage. I know that the property was purchased for me and my brother John by my brother Nicholas. I never saw the deeds; I always trusted my property in Cincinnati to the management of my brother. . . I left all to him.”
Catharine Longworth says : “ She never paid any money, *192 that she knew as little as she eared about any of this property.” By way of explanation of this, she adds :
“ My brother, Nicholas Longworth, long before he was rich and when he had a family of his own, was accustomed to remit to my brother John and Mrs. Morris, means for our support, and in the latter years of our aged father, he amply provided for his wants. These are reasons why I did not keep with him so strict an account as I should with others; indeed, I kept no account at all, excepting as he pressed information upon me which I never called for. I never had in my possession any of the certificates of purchase made in my name, nor did I ever see them that I recollect of.”
It is important to consider the dates of the several conveyances from the administrators and those to Mr. Long-worth, and the times these were placed upon record, keeping in mind the fact that neither Catharine, John, nor Mrs. Morris ever had or saw any of these papers, except the deed they executed to Mr. Longworth. All certificates of purchase and evidences of title were kept in his possession and under his control. The legal conclusions to be drawn from the dates of these conveyances and reconveyances, in connection with proof, is that these other parties were mediums through whom the title was in transit.
The deed, by the administrators to Catharine Longworth, was dated March 1, 1834, and recorded in Book 52, p. 195. Reconveyance, December 17, 1834, recorded in Book 52, p. 128, the last deed being recorded first.
Deed by administrators to Catharine and Lewis Howell, May 29, 1827; recorded in Book 26, p. 622; reconveyed, November 17, 1830.
Deed by administrators to Lewis Howell and Catharine Longworth, May 10, 1828, Book 29, p. 276. Same day, Lewis Howell conveyed an undivided half to J. W. Piatt and Catharine Longworth, recorded Book 29, p. 279 — one-third to Catharine and two-thirds to Piatt.
August 30,1828, Piatt conveyed this two-thirds to Long-worth, which is recorded in same volume.
*193 March 1, 1834, deed by administrators to Samuel Lewis, of property sold in 1827. February 25, 1835, Lewis to Elizabeth Morris and John Longworth, consideration $1, both recorded in Book 53, pp. 536 and 538; while reconveyance to Longworth was dated December 17, 1834, but recorded in Book 52, p. 128, before the others. No delivery of these deeds by the administrators was ever made to them.
Mr. Lewis was the law-partner of Longworth, and Howell was a brother-in-law. Neither paid any money on these purchases, and only ácted as mediums through whom the title passed.
Mr. Longworth says he made the purchases, and advanced the money, “ any profit the property might bring, after repaying him, being intended for our (their) use!” “ I made the investments.” “ The property bid in at the sales, as far as the profit is made, is intended for your benefit.” “I made some purchases for your’s, sister’s, and John’s benefit.”
“ I made some investments here, the profits of which were intended for her (Mrs. Morris’) use.”
To explain to them why he was doing this, he says: “ Had I bought in the name of another for my use, the heirs and creditors would claim the benefit.”
He is careful to limit their interest to the profits. All the circumstances conclusively show that he alone held and managed these investments, with a view to profits, controlling the titles in the meantime, to secure a return of the advances with interest, and donating the profits to them.
The recital in the obligation to Catharine and John is an epitome of the transaction, being certain real estate bought and paid for by the obligor, but the profits thereon for their benefit. This is not the language of a vendor to a purchaser of the land.
He is everywhere careful to discriminate and to describe the transactions as purchases by himself, investments he-has made, the profits to be realized to be theirs.
*194 "Without waiting to realize profits, he obtained a release for a gross sum named by himself. That sum is not ascertained by a settlement “ as with an enemy.” They accept without question what he offers. It is evident he intended these sums as a provision for his less prosperous relatives, and not as a payment of a debt he owed. Catharine says : “ Independent of the sums secured to us . . . my brother has pressed on us to receive larger sums. He has wished us to receive as much as $1,200 a piece per year. In consequence of his so pressing us, I have consented to take $600 a year, and if more money would give me more pleasure, I would receive more.” These relatives were never the debtors of the estate, for the fees of the administrator were applied to pay for the lands. Neither did they owe their brother.' He looked not to them, but to the lands for his advances.
If we leave out of view his representative character, and look at this transaction as between Longworth, individually, and his sisters and brother, his and their interest in these purchases becomes apparent. He saw money could be made, but was debarred from making it for himself. He buys in their names or of others, using his money to make the payment, or rather charging himself as administrator with the amount, and promises them the profits. When •sales should be made, he was to be paid his advances with ■interest and costs. The profits which he was sagacious ■enough to see would accrue, as he can not keep them for himself, he voluntai-ily offers to give to his relatives. As between him and them, he was the owner of the land. Holding the evidences of title in his own hands, he could ;protect this investment of his, for, on his own theory, he was investing money at interest in these lands, the legal title to which was in Piatt’s heirs.
These profits were promised without any valuable eon■sideration. It was purely voluntary, and might have been ¡revoked at pleasure. Being without consideration, they •could not have enforced it.
In what respect does this differ from any other invest *195 ment that may he made with view to profit ? Only in this : He uses other names than his own, and agrees in advance as to the disposition of the profits to he made. His money, his sagacity and skill, his time and trouble, are devoted te this enterprise. As somebody would make money out of these sales, why not he make it for his dependent relatives ? He believed, so long as he did no actual wrong to the estate, he might do this, if he contented himself with a return of his purchase-money and interest (ordinarily an adequate profit on an investment), and gave away thé surplus profits. In this we think he was mistaken. In the eye of the law it makes little difference whether these profits are devoted to profane or pious uses, whether he enjoys them himself or gives them away, pro salute animce. Such a disposition may give satisfaction to the donor, but can never change his relationship to the trust estate, which demands that if any money is to be made out of it by the trustee, the profits shall go to the cestui que trusts.
He is engaged in serving two masters, when good faith demands that he shall serve but one. His position was one demanding the utmost good faith — the uberrima fides of the Roman law. It is a salutary and sound principle that agents to sell can not be purchasers; that the character of seller and buyer are so entirely incompatible, that they never can be united in the same person ; and generally, that trustees of every description, who have power to sell, can not, by direct or indirect means, become the purchasers of trust property. In such cases the court will not suffer itself to be drawn aside from the application of this equitable rule by any attempt on the part of the purchasers to establish the fairness of the purchase, because of the danger of imposition and the presumption of fraud, inaccessible to the eye of the court.
The policy of the rule is to shut the door against temptation in cases where this relationship exists; it is of itself deemed sufficient to create the disqualification. The sale will be set aside, not because there is fraud, but because *196 there may be fraud. “ However innocent the purchaser in the case, it is poisonous in its consequences.”
' There may be fraud, and the party not able to prove it. It is to guard against the uncertainty and hazard of abuse, and to remove the trustee from temptation, that the rule permits the cestui que trust to come at his option and without showing actual injury, and insist on, the experiment of having another sale. This is a remedy which goes deep and touches the root of the evil. Devone v. Fanning, 2 John’s Ch. 252; Barrington v. Alexander, 6 Ohio St. 189; Riddle v. Roll, 24 Ohio St. 572; Michoud v. Girod, 4 How. 503.
These principles are too well settled to be disturbed. They rest upon a foundation that can not be shaken.
They are adopted in the courts in every civilized land, and deserve to be maintained with unswerving fidelity.
That Mr. Longworth occupied, in the case of these purchases, relations inconsistent with his duty to the estate, is beyond controversy; and while there is no evidence of actual injury to the estate, or of actual fraud committed by •him, yet it is abundantly shown that he was interested in these purchases, and active in his efforts to make money out of them.
The fact, if true, that he bestowed the profits on others, certainly can make no difference. That he disposed of them as he had liberally bestowed other moneys on his worthy relatives, showed his kindness of heart. "While this may extenuate his mistake, it can not excuse it,
Rut the respondent insists that even if this be so, this claim is barred:
1. By the settlement of June 19, 1846.
2. By the compromise with the co-administrator.
3. By lapse of time and the statute of limitations.
4. Because there is a fatal variance between the allegations and the proofs.
First. It is claimed that the complainants are estopped by the settlement of June 19, 1846.
*197 In terms, this was a final settlement of their accounts as administrators.
The language iá not broad enough to cover this claim' -for a breach of trust, outside of the line of their duty.
The proof shows that this settlement covered certain and definite things.
The matters now in controversy were not considered or even thought of.
More than all that, the facts out of which the present action arose were concealed from the heirs and wholly unknown to them.
In no possible view, therefore, can we hold that this settlement constitutes a bar to the relief prayed for.
Secondly. It is insisted that the dismissal of the ease, as to B. M. and J. "W. Piatt, is a bar, notwithstanding the reservations made in such dismissal.
This is upon the ground that the action is, in its nature, joint, and a settlement with one bars a recovery as to the other joint obligor.
If this is to be regarded as in the nature of a breach of a joint contract creating a joint indebtedness, then such settlement is no bar.
The act “for the relief of partners and joint debtors” (1 S. & C. 905), which took effect before this settlement with the Piatts, would govern. In 'that case, the right to proceed against the other joint debtor is preserved.
But this is not a case of joint obligation. The claim is joint and several. At law it would have been in the nature of an action on the case.
The administrators, in pursuance of a common plan, acted separately as to distinct sales. Each is liable for his breach of trust, and, in proper cases, they are liable for each other.
In such a case as this, where several are charged with complicity, the complainants are entitled to judgment against as many as are shown to be liable. That the proof fails as to some, furnishes no grounds for denying relief against such as are proved guilty of the wrong.
*198 As to the statute of limitations and lapse of time:
This action was commenced before the code; hence the laws governing like cases in chancery are applicable to this.
Chancery, by analogy, adopted the limitations prescribed by statute for actions at law in proper cases.
By this rule twenty-one years of adverse title and possession would bar such a claim.
The first conveyance from the administrators was in May, 1827, the last, and principal one, December, 1834; so that, as to most of the property, this suit was begun nearly six years before the claim would have been barred.
But these administrators were trustees of an express trust; and, as such, purchases made, either directly or indirectly to themselves, “ the estate will be held in trust for the heirs at law or other persons interested.” Riddle v. Roll, 24 Ohio St. 572.
The holding, in such eases, will not be deemed adverse while the fiduciary relation continues, unless distinctly avowed.
The holding of the trustee inures to the benefit of the cestui que trust at his election.
Until notice of all the facts, time does not begin to run. The burden of proving notice rests upon the party alleging it. Bunnel v. Stoddart, 2 Am. Law Rec. 219.
The recital in the deed to Longworth, in December, 1834, contains, as has been showh, an epitome of the facts on which this claim is founded. This deed was recorded -, 1835, and it is claimed that that recital was notice of his adverse claim.
On its face this was a declaration by the grantor. The fact that it emanated from Longworth did not appear. Hence it was not in the nature of an adverse claim by him. Again, this recital, so far as the proof shows, was unknown to the heirs. Actual notice must be proved, not constructive. Still more, this notice, if sufficient to constitute an adverse holding, would give them twenty-one years to sue after being put on record. The true ground, however, is that the facts on which this claim is founded were *199 not known to the heirs. These facts are found in Mr. Longworth’s letters to his sister, in his obligations made to them when he obtained the releases from them to him, aud in the recital in the quitclaim deed to Longworth.
The bill avers that these facts were unknown to them until some eight months before the suit. Prior to these discoveries these facts were, so far as appears, known only to Mr. Longworth and those acting in concert with him.
Until known to them, they had a right to rely on the good faith and fidelity of these trustees, and time would not run against them.
In general, length of time is no bar to a trust clearly established to have once existed; and when fraud is imputed and proved, length of time ought not to exclude relief unless the equity has become stale. Michoud v. Girod, 4 How. 503; Boone v. Chiles, 10 Pet. 177.
A person ignorant of his right can not be presumed to have abandoned it. Perry on Trusts, sec. 867.
What length of time will constitute a stale equity must depend on the merits of each case.
Relief in chancery is often granted after long lapses of time, in cases of fraud — in some cases after thirty years from the discovery of the fraud. 4 How. S. C. 560.
It is claimed there is a fatal variance between the allegations of the bill and the proofs.
The bill' charges conspiracy between the administrators and others named, who became purchasers, whereby these purchases were to be made for their benefit; and that, in pursuance of this conspiracy, several purchases were made' for the use of B. M. Piatt, and some for the benefit of Lo.ngworth.
It is not alleged that they were jointly interested in these several sales, but severally in different sales in pursuance of a common plan.
In those sales to J. W. Piatt, it is said he was the tool of his father, and in those to Catharine Longworth and others, they were the instruments of Longworth. It is now claimed that the evidence shows that Longworth was *200 the agent of his sisters and brother in these transactions, and not the principal with them as instruments. In this the variance is said to consist.
The test of a variance which would defeat a recovery, as put by Lord Redesdale in 2 Sch. & Lef. 10, in Deniston v. Little, was, whether the case proved was a new case.
In determining this question of departure, it is the legal and not the natural identity which is to be regarded, consisting of those particulars which are essential to the action. In these cases it becomes necessary to ascertain the essential elements of the legal proposition in the controversy. 1 Greenl. Ev., sec. 63.
The substance only of the issue must be proved as alleged, and all immaterial averments may be disregarded. Phillips on Ev., vol. 1, chap. XII.
It can not be claimed that the facts proved in this case do not tend to support the general averments, that in these purchases Longworth was acting in derogation of his duty.
The bill charges in substance that he was interested, and that the other parties were his instruments to accomplish his unlawful purposes.
Giving the evidence the most favorable construction for Longworth, it shows that he was the sole actor in these sales ; that he was interested to the extent of the purchase-money and interest in the lands purchased; and that as to the profits to be made only, was he acting for his relatives. The facts proved in legal identity correspond with the allegations.
The agency of Longworth, so far as any existed, was, as between him and his relatives, only to make profits for them.
In the interpretation of these facts, the solicitor who drew the bill charged, as a conclusion from them, that in law he was principal, and they his instruments. If the court should now hold that the proof showed he was the agent, it would not change the essential facts, only the conclusions from the facts. The substantial identity of the case is the same in allegation and in proof, the legal con *201 elusions from the facts, as drawn by the .pleader and by the. counsel being the only variance.
But we think the proper construction of the written ad* missions of Mr. Longworth, viewed in the clear light of all their surroundings, is that he was the one most deeply interested in these purchases ; that his money was invested, and to the extent of that and the interest on it, he was in equity an owner; that he was at the same time the voluntary agent of his sisters and brothers, so far only as the profits were concerned; and that, during all this time, he was holding the title as trustee of the creditors and heirs, and that he was, in fact, using the names of these purchasers as his instruments, to accomplish his ultimate purpose — namely, gain to himself and contingently profits, which he intended for the comfort of these instruments.
Indeed, as before stated, we are fully warranted in holding that in legal contemplation, and however honest his intentions, he is to be regarded as the purchaser.
The liability of Longworth does not depend upon the acts of Piatt in this case, but on his own. Each, in a proper case, would be liable for the misconduct of the other in an action on their bond. But here- the charge is that Piatt and his associates made certain purchases for his interest, and that Longworth and his associates made certain other purchases for his interest.
The liability in either case is wholly independent of that as to the other.
Upon the whole case, therefore, we have been forced to the clear conviction that as to these sales in controversy, the heirs have an undoubted right to relief in equity.

Decree for complainants.

Scott, Chief Judge, and Day, J., concurred.